# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 94-CA-00385-SCT

*LEIGH ANN HASSETT*

*v.*

*THOMAS R. HASSETT*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/25/93 |
| TRIAL JUDGE: | HON. NATHAN P. ADAMS JR. |
| COURT FROM WHICH APPEALED: | WASHINGTON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | E. MICHAEL MARKS |
| | JOHN ROBERT WHITE |
| ATTORNEY FOR APPELLEE: | PHILIP MANSOUR, JR. |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 2/27/97 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 3/20/97 |

**BEFORE DAN LEE, C.J., BANKS AND MILLS, JJ.**

**MILLS, JUSTICE, FOR THE COURT:**

¶1. Leigh Ann Hassett filed for a divorce from Thomas R. Hassett in the Chancery Court of Washington County, alleging as grounds for divorce habitual cruel and inhuman treatment. Thomas Hassett counterclaimed for divorce on the grounds of adultery. On August 25, 1993, the chancellor denied Leigh Ann Hassett a divorce and granted Thomas Hassett a divorce on the grounds alleged. In his judgment, the chancellor awarded to Thomas Hassett physical custody of the parties' minor child and ordered a division of marital property. Aggrieved by said judgment, Leigh Ann Hassett appeals to this Court, assigning as error the following issues.

> **I. WHETHER THE CHANCELLOR ERRED IN DENYING LEIGH ANN HASSETT A DIVORCE ON THE GROUNDS OF HABITUAL CRUEL AND INHUMAN TREATMENT.**

> **II. WHETHER THE CHANCELLOR ERRED IN GRANTING THOMAS HASSETT A DIVORCE ON THE GROUNDS OF ADULTERY.**

**III. WHETHER THE CHANCELLOR ERRED IN AWARDING TO THOMAS HASSETT PHYSICAL CUSTODY OF THE PARTIES' MINOR CHILD, KYLE HASSETT.**

**IV. WHETHER THE CHANCELLOR ERRED IN HIS DIVISION OF MARITAL PROPERTY.**

## FACTS

¶2. Thomas and Leigh Ann Hassett were married on July 20, 1985. The couple lived in Hollandale, Mississippi and had a single child, Kyle, who was six years old at the time of trial. The parties separated on October 8, 1992. Five days later, on October 13, Leigh Ann filed her complaint for divorce on the grounds of habitual cruel and inhuman treatment. On December 23, 1992, Thomas filed his counterclaim for divorce on the grounds of adultery.

¶3. At trial, Leigh Ann testified regarding various items which she claimed constituted habitual cruel and inhuman treatment by Thomas, one of which was mental and emotional abuse. She testified that Thomas was very domineering, possessive and controlling. She claimed he was very critical of her cooking and cleaning, and that he often used harsh language including swear words. Dot Lamb, Leigh Ann's mother, testified that once when she was visiting her daughter, "[h]e came in and he said, 'What have you done with my money?' She didn't say anything, and he said, 'Nobody f 's with my money you damn bitch.'" This incident occurred when the parties were separated and just after Leigh Ann, without Thomas's consent, had withdrawn $25,000 from the couple's joint savings account.

¶4. Leigh Ann testified that occasionally when he was angry, Thomas would hit the walls with his fists and throw objects such as bar stools, a bicycle, toys and a football helmet. Marvin Logan, Leigh Ann's father, testified that once when he was visiting at the parties' home, Thomas was criticizing a dish that Leigh Ann had prepared when "the first thing I knew they were down on the floor and he had her around the neck." Leigh Ann testified that on one occasion, Thomas raised his hand as if to strike her, but she admitted he never physically struck her during the seven years of their marriage.

¶5. Leigh Ann also alleged sexual abuse as grounds of habitual cruel and inhuman treatment. She testified that on occasion Thomas would force himself upon her sexually, and that when she told him it was uncomfortable for her, he would not listen to her. She claimed Thomas forced her to have sex on two occasions. She testified these incidents caused her physical pain, for which she sought treatment from a doctor. The doctor suggested birth control pills, which Leigh Ann declined to take, and creams and ointments, which she used but which she testified did not completely solve the problem. Nonetheless, she continued to have frequent sex with Thomas because "Thomas felt that that's what he deserved and it didn't matter whether I was in pain, or it bothered me, or how I felt, or my feelings, he just -- he would take it upon himself to take that from me without regard to how I was feeling. It didn't matter. He just did it."

¶6. Leigh Ann also alleged habitual cruel and inhuman treatment in the nature of illegal activities conducted by Thomas in the home. In her testimony she described a scheme whereby Thomas, who was a pharmacist, would receive free pharmaceutical samples from a doctor, store them in the home, remove the pills from the sample packaging, place the drugs in other containers and sell them to customers at his drugstore. Leigh Ann testified that Thomas would enlist the help of the couple's son,

Kyle, when punching the pills out of the sample packaging.

¶7. Dr. Wesley Marner, claimed by Leigh Ann to have supplied Thomas with the samples, admitted he had given sample drugs to Thomas, but testified the drugs were for Thomas's father, mother, son and wife. Both Chris Wilson, a friend of Leigh Ann, and Dot Lamb, Leigh Ann's mother, testified they had seen a box full of sample pills stored in the Hassett's guest bedroom. Marvin Logan, Leigh Ann's father, testified he had received several telephone calls from Thomas during which Thomas expressed concern "that if the wrong people found out what he had done with these sample drugs that it could create a serious problem for him to the tune of losing his license or maybe even worse."

¶8. Regarding Thomas's allegation of adultery, he first became suspicious of his wife in May of 1992 when he found fifteen greeting cards in her tennis bag in her van. The cards were mailed to Leigh Ann at a post office box which she never told her husband she had, and they were signed by a man named Ricky. Although Leigh Ann testified she did not remember receiving the cards, Ricky Landers admitted sending them to her. The cards, admitted into evidence, included five birthday cards sent on the same day and a Valentine's Day card. The cards expressed terms of endearment and most of them were signed, "Love, Ricky."[1] When Thomas confronted Leigh Ann about the cards, she told him Ricky was just a friend she had met in Greenwood.

¶9. Thomas employed Billy Randall, a private detective, who testified that on the evening of November 15, 1992, he observed Leigh Ann Hassett and Ricky Landers enter room 253 of the Holiday Inn in Grenada, Mississippi. Mr. Randall and his wife observed the room all night long and saw no one enter or leave the room until 5:15 the following morning, when Ricky Landers came out of the room, got into his car and drove away. Mr. Randall later observed Leigh Ann leave the room around 9:30 a.m. carrying a shoulder tote bag. Mr. Randall took photographs of Leigh Ann's vehicle and of Leigh Ann leaving the hotel room that morning, which photographs were admitted into evidence.

¶10. Mr. Randall testified that he and his wife again conducted surveillance of Leigh Ann Hassett on the evening of November 21, 1992. Mr. Randall observed Leigh Ann and Ricky leave room 253 of the Holiday Inn in Grenada around 9:35 p.m., get into Ricky's Blazer, drive to the Rag-Time Restaurant and enter the restaurant. Leigh Ann and Ricky left the restaurant around 11:15 p.m., drove back to the hotel and reentered room 253. No one entered or left the room again until 11:00 the following morning, when Leigh Ann and Ricky came out together. Ricky helped Leigh Ann put her clothes into her van, after which they got into their separate vehicles and left. Mr. Randall took photographs of Leigh Ann and Ricky as they left the room that morning, which photographs were admitted into evidence.

¶11. At trial, both Leigh Ann and Ricky denied ever having had sexual relations with each other. Leigh Ann testified she met Ricky in a bar sometime in the spring of 1992 while she was in Greenwood playing in a tennis tournament. She testified that she "ran into" Ricky on only one or two occasions after that. She could explain neither how Ricky came to have her post office box address nor how he knew when her birthday was. Leigh Ann testified she could not remember ever staying at the Holiday Inn in Grenada, and she specifically denied spending the night there in a room with Ricky Landers on November 15 and 21, 1992. Registration forms from the Grenada Holiday Inn showed four overnight stays there by Ricky Landers from October 27 to November 21, 1992, including the

two dates on which Billy Randall conducted his surveillance of Leigh Ann. When asked why he stayed there four times in one month, Ricky testified he had "no idea."

¶12. During the marriage, Thomas worked at his drugstore six days a week from 7:00 a.m. to between 7:00 and 8:30 p.m. In 1991, Thomas took on a partner in the drugstore so that he could spend more time with his son. Leigh Ann occasionally helped out at the drug store, but otherwise she was unemployed. She spent most of her time fulfilling the domestic duties of housewife, such as cooking, cleaning and caring for Kyle. However, Thomas testified that beginning in January of 1992, he became primarily responsible for caring for Kyle. That year, Leigh Ann began to spend a good deal of time away from home, going on numerous trips of two days or more. When she was gone, Thomas was the sole care giver for Kyle. Beginning in July of that year, Thomas marked on a calendar the times Leigh Ann left town, which record showed that from July of 1992 to June of 1993, Leigh Ann was out of town approximately 135 days.

¶13. The parties continued to live in the same house in Hollandale after their separation in October of 1992. For some time prior to their separation, Thomas and Leigh Ann had been planning and building a new house in Arcola, Mississippi, which house was completed on June 1, 1993. At that time, Leigh Ann was away on one of her trips, and Thomas and Kyle moved into the new house. Leigh Ann testified that when she returned home from her trip, she wanted to go get Kyle, but Thomas told her that "I don't think it would be a good idea and that I wouldn't like what he would do to me if I came up there." Thomas testified that Leigh Ann in fact did come pick Kyle up when she returned home on June 8th, and that she had Kyle again that weekend. Thomas testified he and Leigh Ann made an arrangement whereby Kyle would stay with her on Wednesdays when she was off work and on weekends. However, Thomas testified that "[t]he following Tuesday which I thought she would call and want to come pick him up, she didn't. She didn't keep him that Wednesday when she was off. The following weekend she never called and never questioned me about picking him up. She was gone that weekend."

¶14. The testimony was uncontradicted that Kyle loved to do things with his father such as hunting, fishing and riding four wheelers. Thomas testified that over the last year before trial, with Leigh Ann not being around much, his relationship with Kyle had grown much stronger while Kyle had grown distant from his mother. Dr. Wood Coleman Hiatt, a psychiatrist specializing in child and adolescent psychiatry who conducted evaluations of Thomas, Leigh Ann and Kyle, gave the same opinion. Dr. Hiatt testified that Kyle's best interest would lie in the custody of his father.

¶15. At the time the parties were married in 1985, Thomas owned the home in Hollandale which became the marital residence, a joint interest in 89 acres of hunting land in Carroll County, and 49% interest in City Drug Store in Hollandale. In 1986 or 1987, Thomas acquired the remaining 51% interest in City Drug Store, and then sold 25% in 1991, leaving him with a 75% interest in the drug store at the time of trial. In 1985 or 1986, Thomas acquired a joint interest in a hunting club at Catfish Point in Bolivar County. In 1992, Thomas acquired a 50% interest in Magic Mart Pharmacy in Indianola, Mississippi. At the time of trial, Thomas also owned a 1992 Chevrolet pickup truck which he drove and a 1988 Ford Aero Star van which Leigh Ann drove. He owned jointly with Leigh Ann the new home in Arcola. Thomas also had about $21,000 in cash on hand, whole life insurance policies with a cash value of about $15,000, and an individual retirement account in the amount of $25,400. For the three or four years prior to trial, Thomas's income was approximately $150,000 per

year. He was forty years old.

¶16. At the time of trial, Leigh Ann, who dropped out of junior college prior to her marriage to Thomas, was earning $378 per month working three days a week for an optometrist in Rolling Fork, Mississippi. In addition to her joint interest in the Arcola home, she had an IRA account with a value of about $15,500 and a whole life insurance policy with a cash value of about $1,350. It is unclear how much remained of the $25,000 which she withdrew from the couple's joint checking account. She was thirty-one years old.

¶17. After hearing all the evidence at trial, the chancellor denied Leigh Ann a divorce on the grounds of habitual cruel and inhuman treatment and granted Thomas a divorce on the grounds of adultery. The court awarded to both parties joint legal custody of Kyle, and awarded physical custody of Kyle to Thomas. The chancellor awarded to Leigh Ann periodic alimony in the amount of $1,000 per month and the use and possession of the Hollandale home so long as she occupies it as a primary residence, with Thomas to be responsible for insurance, taxes, structural upkeep and any mortgage debt. The chancellor also awarded to Leigh Ann ownership of the 1988 Ford Aero Star van, and ordered an equal division of the furnishings and appliances in the Hollandale and Arcola homes. The court awarded to Thomas the use and possession of the Arcola home, with Thomas to be responsible for the $150,000 in mortgage debt thereon, as well as for any other joint debts of the parties. Finally, the chancellor awarded to Leigh Ann $1,500 in attorney fees and ordered Thomas to pay all court costs.

## DISCUSSION

### I. WHETHER THE CHANCELLOR ERRED IN DENYING LEIGH ANN HASSETT A DIVORCE ON THE GROUNDS OF HABITUAL CRUEL AND INHUMAN TREATMENT.

¶18. The divorce grounds of habitual cruel and inhuman treatment may be established by a showing of conduct that either (1) endangers life, limb, or health, or creates a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief, or (2) is so unnatural and infamous as to make the marriage revolting to the non-offending spouse and render it impossible for that spouse to discharge the duties of marriage, thus destroying the basis for its continuance. *Daigle v. Daigle*, 626 So. 2d 140, 144 (Miss. 1993); *Gardner v. Gardner*, 618 So. 2d 108, 113-14 (Miss. 1993). Habitual cruel and inhuman treatment may be established by a preponderance of the evidence, and the charge "means something more than unkindness or rudeness or mere incompatibility or want of affection." *Daigler*, 626 So. 2d at 144 (quoting *Smith v. Smith*, 614 So. 2d 394, 396 (Miss. 1993)). On appeal, this Court will overturn the chancery court only when its findings were manifestly wrong and there is no substantial evidence to support those findings. *Daigler*, 626 So. 2d at 144; *Lenoir v. Lenoir*, 611 So. 2d 200, 203 (Miss. 1992).

¶19. Leigh Ann Hassett contends the evidence showed conduct on the part of Thomas that created a reasonable apprehension of danger, rendering the relationship unsafe for Leigh Ann, and that was so unnatural and infamous as to make the marriage revolting to Leigh Ann, rendering it impossible for her to discharge the duties of marriage. She relies on evidence of Thomas' mental and emotional abuse, sexual abuse and illegal activities conducted in the home.

¶20. Leigh Ann complains first of Thomas' bullying, intimidation and constant criticism of her performance of household chores. This Court has held that such conduct does not fulfill the requirements of a divorce on the grounds of habitual cruel and inhuman treatment. *Steen v. Steen*, 641 So. 2d 1167, 1170 (Miss. 1994); *Gallaspy v. Gallaspy*, 459 So. 2d 283, 285 (Miss. 1984). Leigh Ann also claims Thomas had a violent temper and was prone to throwing objects when angry, yet she admits he never struck her. Although actual physical abuse is not a requirement for a showing of habitual cruel and inhuman treatment, we find the conduct here complained of does not rise above the level of "unkindness or rudeness or mere incompatibility or want of affection."

¶21. Leigh Ann claims Thomas forced himself upon her sexually, even forcing her to have sex with him against her will on two occasions. At trial, Leigh Ann was the only person who testified that such abuse occurred. She testified she saw a doctor for treatment of the pain caused by these incidents, but she nonetheless continued to have frequent sex with Thomas. In *Chamblee v. Chamblee*, 637 So. 2d 850, 860 (Miss. 1994), in which the chancellor denied the wife a divorce on the grounds of habitual cruel and inhuman treatment where she was the only witness who offered testimony regarding physical and sexual abuse, this Court affirmed the ruling, stating:

> If Sheila's allegations about David beating her and forcing her to have sex with him against her will had proven to be true, then a charge of cruel and inhuman treatment would probably have been justified. However, the evidence presented in this case is not such that the chancellor's holding can be said to be manifestly wrong as to law or fact, even if one uses a jaundiced eye.

Likewise, the chancellor's finding that Leigh Ann's claim of sexual abuse did not warrant a divorce was not manifestly wrong.

¶22. Regarding Leigh Ann's allegation of illegal activities conducted by Thomas involving sample pharmaceuticals, the chancellor noted in his bench ruling that federal law prohibits the sale, purchase or trade of any drug sample, but that possession alone is not condemned. However, the chancellor stated that "whether or not a violation occurred is irrelevant insofar as the divorce proceeding is concerned. The question is whether or not Mrs. Hassett reasonably believed it to be illegal, protested to the defendant, and as a result of his refusal to discontinue the practice, she entertained a reasonable apprehension of danger to life, limb or health."

¶23. Leigh Ann testified that her husband's activities caused her to be afraid that her home would be raided and that there would be criminal prosecution. She also claimed the activities caused her mental anguish. Interestingly, the three people in whom Leigh Ann confided her marital problems -- her best friend Chris Wilson, her mother Dot Lamb and her marriage counselor David Wilson -- indicated that Leigh Ann never made mention to them of any problem concerning Thomas' alleged activities involving sample drugs. Furthermore, although she claimed to be afraid of Thomas and to fear criminal prosecution, Leigh Ann continued to live in the same house with him -- even after their separation -- until he moved into the Arcola home while she was away. Although she claimed her reason for doing so was because she was unable to afford separate housing, the evidence showed she withdrew $25,000 from the couple's joint checking account, a sum we believe would sufficiently cover the costs of renting a house or an apartment.

¶24. We cannot say the chancellor was manifestly wrong in finding Thomas' alleged conduct did not

cause Leigh Ann to suffer apprehension of danger to life, limb or health, nor did it make the marriage relationship so revolting to her as to render impossible the discharge of the duties of marriage. We therefore affirm the denial of Leigh Ann's request for a divorce on the grounds of habitual cruel and inhuman treatment.

## II. WHETHER THE CHANCELLOR ERRED IN GRANTING THOMAS HASSETT A DIVORCE ON THE GROUNDS OF ADULTERY.

¶25. The divorce grounds of adultery may be proven by clear and convincing evidence of: (1) an adulterous inclination or an infatuation for a particular person of the opposite sex; and (2) a reasonable opportunity to satisfy that inclination or infatuation. *McAdory v. McAdory*, 608 So. 2d 695, 699-700 (Miss. 1992); *Owen v. Gerity*, 422 So. 2d 284, 287 (Miss. 1982). Where adultery is sought to be proven by circumstantial evidence, the conclusion sought to be established must follow logically from the facts and must be inconsistent with a reasonable theory of innocence. *Dillon v. Dillon*, 498 So. 2d 328, 330 (Miss. 1986); *Owen*, 422 So. 2d at 287. This Court will not overturn the chancellor's findings unless those findings are manifestly wrong, clearly erroneous or an erroneous legal standard was applied. *McAdory*, 608 so. 2d at 699.

¶26. The chancellor below found both an adulterous inclination on the part of Leigh Ann as evidenced by the greeting cards received by her from Ricky Landers and a reasonable opportunity to satisfy that inclination as evidenced by the testimony of Billy Randall regarding the nights Leigh Ann spent with Ricky at the Grenada Holiday Inn. Leigh Ann argues the chancellor's findings on both points were manifestly wrong.

¶27. Leigh Ann contends first that the alleged receipt of the greeting cards, over which she had no control, did not rise to the level of clear and convincing evidence of an adulterous inclination on her part. She argues that although the cards might show friendly feelings towards her by Ricky, the cards do not prove such feelings were mutual. We find Leigh Ann's argument must fail.

¶28. The cards found by Thomas included a Valentine's Day card and five birthday cards sent on the same day, and contained terms of endearment from Ricky expressing that he loved Leigh Ann, missed her and always enjoyed seeing her -- sentiments that suggest something more than a mere unreciprocated friendship. In *McAdory*, wherein this Court found insufficient evidence of an adulterous inclination, the Court noted that none of the notes found in Mrs. McAdory's possession were addressed to her by the alleged paramour. 608 So. 2d at 701. The cards found in Leigh Ann's possession, however, were all addressed to her by Ricky Landers, and at a post office box address about which Leigh Ann never told her husband. Moreover, whereas Mrs. McAdory offered a reasonable theory of innocence, Leigh Ann did nothing more than deny any knowledge of the receipt of the cards. She could offer no explanation as to how Ricky got her post office box address, how he knew when her birthday was, why he missed her, or what he was referring to when he wrote that he always enjoyed seeing her, looked forward to seeing her again, and asked her "why the hell you had to leave."

¶29. Furthermore, if these facts alone do not logically tend to prove an adulterous inclination towards Ricky on the part of Leigh Ann, then they may be considered together with the testimony of the private detective, Billy Randall. This testimony is not limited to showing only a reasonable opportunity to satisfy, but rather such evidence tends to prove as well the adulterous inclination itself.

What stronger evidence of an adulterous inclination is there than that Leigh Ann on at least two occasions spent the night alone in an hotel room with a man from whom she had received numerous cards expressing terms of endearment? We hold the chancellor's finding of an adulterous inclination on the part of Leigh Ann was not manifestly wrong.

¶30. Regarding the chancellor's finding of a reasonable opportunity to satisfy, there can be little question that Billy Randall's testimony, together with his photographs, satisfies this prong of the two-part test for adultery. Leigh Ann argues both that the photographs themselves do not show an opportunity to satisfy and that photographs alone do not suffice as the sole corroborating evidence of adultery. Again, her argument must fail.

¶31. The flaw in Leigh Ann's argument is that she assumes that the only evidence upon which the chancellor based his finding of a reasonable opportunity to satisfy was the photographs taken by Billy Randall, which photographs admittedly do not show Leigh Ann and Ricky together in the same frame. The most incriminating evidence, however, was Mr. Randall's testimony itself, which clearly described two occasions upon which he observed Leigh Ann and Ricky enter a room together at the Grenada Holiday Inn, after which no one entered or left the room again until the following morning. Furthermore, Leigh Ann did not offer a reasonable theory of innocence, but simply denied these incidents altogether.

¶32. Regardless of the sufficiency of photographs as the sole corroborating evidence in a divorce action, they were not used as such in the case *sub judice*. Rather, they were used to corroborate the testimony of a competent third party witness, whose testimony alone likely would have sufficed, and who described both what the photographs depicted and when and where he took them. We hold the chancellor did not err in granting Thomas a divorce on the grounds of adultery.

### III. WHETHER THE CHANCELLOR ERRED IN AWARDING TO THOMAS HASSETT PHYSICAL CUSTODY OF THE PARTIES' MINOR CHILD, KYLE HASSETT.

¶33. The polestar consideration in all child custody cases is the best interest of the child. *Sellers v. Sellers*, 638 So. 2d 481, 485 (Miss. 1994); *Moak v. Moak*, 631 So. 2d 196, 198 (Miss. 1994). This Court has set forth a number of factors to be considered by chancellors when making custody determinations:

> The age of the child is . . . but one factor to be considered. Age should carry no greater weight than other factors to be considered, such as: health, and sex of the child; a determination of the parent that has had the continuity of care prior to the separation; which has the best parenting skills and which has the willingness and capacity to provide primary child care; the employment of the parent and responsibilities of that employment; physical and mental health and age of the parents; emotional ties of parent and child; moral fitness of parents; the home, school and community record of the child; the preference of the child at the age sufficient to express a preference by law; stability of home environment and employment of each parent, and other factors relevant to the parent-child relationship.

*Sellers*, 638 So. 2d at 485 (quoting *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983)). This Court will uphold the factual findings of the chancellor if the findings are not manifestly wrong or

substantially erroneous. *Sellers*, 638 So. 2d at 483; *Crow v. Crow*, 622 So. 2d 1226, 1227 (Miss. 1993).

¶34. Leigh Ann argues the chancellor made an incorrect assessment of the *Albright* factors in awarding physical custody of Kyle to Thomas. The chancellor's findings as to each of the factors are discussed in turn below.

¶35. *Age and Sex of the Child.* Kyle was six years old at the time of trial. The chancellor agreed with Dr. Hiatt that the fact that Kyle is a boy strongly favored the father's fitness for custody since the child was entering an age when male guidance is needed. Also, as Thomas points out, the evidence was clear that at the time of the divorce, Kyle's interests had grown more to outdoor activities that he enjoyed with his father, such as hunting, fishing, playing softball and riding four wheelers.

¶36. *Continuity of Care Prior to the Separation.* The chancellor found that prior to the couple's marital difficulties, Leigh Ann was the primary caretaker of Kyle. However, the chancellor noted that due to Leigh Ann's frequent absences from the home during the last year of the marriage and to Kyle's absence from his mother during the separation, the relationship had eroded, and thus Thomas had assumed the role of primary care giver.

¶37. *Parenting Skills.* The chancellor found Leigh Ann and Thomas were equally capable in exercising parenting skills.

¶38. *Employment of the Parent and the Responsibilities of that Employment.* The chancellor found Thomas' employment was obviously superior to that of Leigh Ann. The chancellor found that because Thomas owned his business, he had the ability to leave work to tend to Kyle's needs. Additionally, the chancellor found that Thomas's parents, who unlike Leigh Ann's parents lived nearby and had taken a very active role in Kyle's life, were present to help. The chancellor found Leigh Ann was employed three days per week and had to depend on other parties during this period.

¶39. *Physical and Mental Health and Age of the Parents.* The chancellor found that Leigh Ann, thirty-one years old at the time of trial, and Thomas, forty at the time of trial, were equally fit with respect to health factors.

¶40. *Emotional Ties of Parent and Child.* The chancellor found that each parent loved Kyle and the parents were equally fit with regard to emotional ties with the child.

¶41. *Moral Fitness of the Parents.* Finding this issue to be "extremely troubling," the chancellor noted that marital fault should not be used as a sanction in custody determinations, but that the court must take adultery into consideration in addressing the issue of moral fitness. The chancellor found such conduct did not impact negatively on Leigh Ann's fitness as a parent. Regarding Leigh Ann's allegation of Thomas' illegal activity involving sample drugs, the chancellor noted that no charges had been filed and there was no evidence of the sale of such drugs by Thomas. The chancellor concluded that on balance, Thomas was the preferred parent on the issue of moral fitness.

¶42. *Home, School and Community Record of the Child.* The chancellor found Kyle was not yet of an age to have developed a record in the community or at school. The chancellor discounted the activity of the child in kindergarten.

¶43. *The Preference of the Child.* The chancellor noted that Kyle by law was not old enough to express a custody preference.

¶44. *Stability of the Home Environment.* Although he found the parents to be equally fit with regard to home environment, the chancellor noted Dr. Hiatt's testimony that Kyle's paternal grandparents would lend stability to Thomas's household.

¶45. Taking all of the above factors into consideration together with the evidence of the case, the chancellor concluded the best interests of Kyle would be served by awarding his joint legal custody to Leigh Ann and Thomas with physical custody to be awarded to Thomas. We find the chancellor's determination was not manifestly wrong or substantially erroneous.

## IV. WHETHER THE CHANCELLOR ERRED IN HIS DIVISION OF MARITAL PROPERTY.

¶46. In **Hemsley v. Hemsley**, 639 So. 2d 909, 915 (Miss. 1994), this Court determined that marital assets subject to equitable distribution by the chancellor upon divorce are any and all assets "acquired or accumulated during the marriage." A spouse who has made a material contribution toward the acquisition of an asset titled in the other spouse's name may claim an equitable interest in such jointly accumulated property. **Hemsley**, 639 So. 2d at 913; **Jones v. Jones**, 532 So. 2d 574, 580-81 (Miss. 1988). Assets are not subject to distribution where it can be shown that such assets "are attributable to one of the parties' separate estates prior to the marriage or outside the marriage." **Hemsley**, 639 So. 2d at 914.

¶47. In **Ferguson v. Ferguson**, 639 So. 2d 921, 928 (Miss. 1994), this Court set forth the factors to be considered by chancellors when making equitable divisions of marital property:

1. Substantial contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows:

a. Direct or indirect economic contribution to the acquisition of the property;

b. Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and

c. Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets.

2. The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise.

3. The market value and the emotional value of the assets subject to distribution.

4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;

5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;

6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;

7. The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity; and,

8. Any other factor which in equity should be considered.

¶48. The equitable distribution of marital assets is committed to the discretion of the chancellor, whose findings will not be disturbed by this Court unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied. *Ferguson*, 639 So. 2d at 928, 930.

¶49. Leigh Ann argues the chancellor erred in using the "title theory" method of marital property distribution -- abandoned by this Court in *Draper v. Draper*, 627 So. 2d 302, 305 (Miss. 1993) -- rather than the "equitable distribution" method now used by Mississippi courts. As reflected in the chancellor's judgment, however, this simply is not the case. The chancellor did, in fact, order Thomas to convey title of the 1988 Ford Aero Star van to Leigh Ann, which order would have been prohibited under the title theory method. The thrust of Leigh Ann's argument is that the chancellor failed to divide certain assets which were subject to equitable distribution.

¶50. Specifically, Leigh Ann complains she was awarded no portions of Thomas's interest in the hunting club at Catfish Point in Bolivar County, his 75% interest in City Drug Store in Hollandale (Thomas owned only 49% at the time of the marriage), and his 50% interest in Magic Mart Pharmacy in Indianola. She points out that each of these assets was acquired "during the marriage," and thus was subject to equitable distribution under the *Hemsley* definition of marital property. However, "there is no automatic right to an equal division of jointly-accumulated property, but rather, the division is left to the discretion of the court." *Ferguson*, 639 So. 2d at 927 (quoting *Draper*, 627 So. 2d at 305); *see also Dillon v. Dillon*, 498 So. 2d 328, 330 (Miss. 1986). "In the final analysis, all awards should be considered together to determine that they are equitable and fair." *Ferguson*, 639 So. 2d at 929.

¶51. The chancellor awarded to Leigh Ann $1,000 per month in periodic alimony, ownership of the 1988 Ford Aero Star van, one-half of the parties' furnishings and appliances, and use and possession of the marital home in Hollandale, with Thomas to be responsible for insurance, taxes, structural upkeep and any mortgage debt. In addition, Leigh Ann owns one-half interest in the Arcola home, with Thomas to be responsible for the $150,000 in mortgage debt thereon as well as for any other joint debts of the parties. Although Thomas was awarded physical custody of Kyle, the chancellor did not order Leigh Ann to pay child support. It is also appropriate to note that prior to trial Leigh Ann, without Thomas' consent, withdrew $25,000 from the couple's joint checking account. Given all the evidence before this Court, we find these awards were equitable and fair, and thus the chancellor's division of marital property was not manifestly wrong or clearly erroneous.

## CONCLUSION

¶52. Finding no merit among Leigh Ann Hassett's assignments of error, we affirm the chancery court judgment below.

¶53. **AFFIRMED.**

**LEE, C.J., PRATHER AND SULLIVAN, P.JJ., PITTMAN, BANKS, McRAE, ROBERTS AND SMITH, JJ., CONCUR.**

1. The following is a list of the inscriptions on some of the cards:

"Always enjoy seeing you."

"Just thinking of you. Have a nice day."

"Missing you is more fun than being with anyone else!"

"Consider yourself hugged!"

"Would you do something for me? Could you explain to me again why the hell you had to leave?"

"It will be wonderful to see you again."

"You're not really far away. Hope to see you soon."

"You're there and I'm here. You know what that means. One of us is in the wrong place!"

"Just to prove I thought of you today."