989 So.2d 920 (2008)
Thomas Willard POOL, Jr., Appellant
v.
Sherry Clay POOL, Appellee.
No. 2006-CA-01237-COA.
Court of Appeals of Mississippi.
January 15, 2008.
Rehearing Denied May 20, 2008.
Certiorari Denied August 7, 2008.
*922 J. Stewart Parrish, Meridian, attorney for appellant.
Robert James Bresnahan, Meridian, attorney for appellee.
Before KING, C.J., CHANDLER and CARLTON, JJ.
CHANDLER, J., for the Court.
¶ 1. Thomas Willard "Buddy" Pool (Buddy) and Sherry Clay Pool (Sherry) are married. Sherry filed a complaint for separate maintenance, and Buddy filed a complaint for a divorce. The Chancery Court of Lauderdale County denied the divorce and ordered Buddy to pay Sherry separate maintenance and attorney's fees. Buddy appeals, arguing that: (1) the chancellor abused her discretion in denying Buddy's motion for a continuance based upon a discovery violation, (2) the chancellor erred by dismissing Buddy's complaint for a divorce on the ground of adultery, (3) the chancellor erred by ordering Buddy to pay separate maintenance, and (4) the attorney's fees award was manifestly erroneous because Sherry had the ability to pay her own attorney's fees.
¶ 2. Finding no error, we affirm.

FACTS
¶ 3. This case involves the parties' second marriage to each other. Buddy and Sherry were married in August 1966 and divorced in October 1980. They remarried on December 19, 1981. Buddy fully retired from public service in 2000, and Sherry worked as a hospital administrator. On or about October 10, 2003, Buddy told Sherry he was leaving her in two weeks' time. Buddy moved out on November 29, 2003, prompting Sherry's suit for separate maintenance. Buddy subsequently filed a complaint for a divorce on the ground of habitual cruel and inhuman treatment, and he twice amended the complaint to allege the additional grounds of adultery and constructive desertion.
¶ 4. On May 30 and 31, 2006, a hearing occurred on Sherry's claim for separate maintenance and Buddy's claim for divorce on the ground of adultery. Buddy withdrew the other asserted grounds for divorce. Buddy testified that the marital relationship began to decline after he retired. Buddy said Sherry continually nagged him about the quality of his housework and made unfounded accusations that he was seeing other women while she was at work. Buddy said this behavior by Sherry forced him to leave. Sherry admitted that she had been stressed at work and that this affected how she treated Buddy, but denied nagging him about the housework. Sherry testified that some problems in the marriage were caused by Buddy's absorption with maintaining his 1954 Kaiser Manhattan automobile. She said that, when Buddy told her he was leaving, she begged him on her knees not to do so and said she would go to counseling. According *923 to Sherry, Buddy replied that, after twenty-two years, she was not worth counseling.
¶ 5. Buddy did not leave in two weeks. Sherry testified that he rented an apartment and began re-titling jointly held assets in the names of himself and their daughter, Shelby Slade. Sherry also re-titled jointly held assets in her own name. She stated they were getting along better and, after a few weeks, she asked Buddy if he was still moving out. Sherry testified that Buddy became "ugly" with her and told her that she would be the first to know when he was leaving. She told him to leave that day, and Buddy moved out.
¶ 6. During the separation, Buddy and Sherry ate meals together on an occasional basis, and Sherry assisted Buddy after his prostate surgery. Buddy testified that Sherry told him she loved him on one or two occasions after he moved out. Sherry testified that Buddy had increasing memory problems and that she aspired to care for Buddy in his declining years. Buddy testified that he wanted a divorce. He denied having a sexual relationship with anyone else.
¶ 7. Buddy hired Bobby House, a private investigator, to conduct surveillance of Sherry's activities. House testified that he began conducting periodic surveillance of Sherry in May or June 2005 and ended it just prior to the hearing in May 2006. He testified that, during this time, the only incident worth reporting was that Sherry spent three consecutive nights in November 2005 at the apartment of Vince Miller, a former co-worker of Buddy's. House videotaped the outside of the apartment and captured Sherry and Miller coming and going, but he did not capture the two being affectionate with one another. Sherry denied having had sexual relations with Miller and insisted there was a third person in the apartment with them on all three nights who could verify that there were no sexual relations between Sherry and Miller.
¶ 8. The chancellor dismissed Buddy's claim for a divorce on the ground of adultery due to insufficient evidence establishing adultery. The chancellor found that Sherry was not materially at fault for the separation and granted her separate maintenance in the amount of $500 per month. Sherry was granted exclusive use and possession of the marital home and of her car. The chancellor also ordered Buddy to pay some of Sherry's expenses, such as her health, homeowners', and car insurance, property taxes on the home, and a portion of her medical expenses and repair costs on the home and car. The chancellor granted Sherry attorney's fees in the amount of $5,000, plus an additional $500 for the successful prosecution of a contempt motion that is not a subject of this appeal.

STANDARD OF REVIEW
¶ 9. This Court will affirm the decision of the chancellor when it is supported by substantial evidence unless the chancellor abused her discretion, the decision was manifestly wrong or clearly erroneous, or the chancellor applied an erroneous legal standard. Chapel v. Chapel, 876 So.2d 290, 293(¶ 8) (Miss.2004). We review all questions of law de novo. Townsend v. Townsend, 859 So.2d 370, 372(¶ 7) (Miss. 2003).

LAW AND ANALYSIS

I. WHETHER THE CHANCELLOR ABUSED HER DISCRETION IN DENYING BUDDY'S MOTION FOR A CONTINUANCE.
¶ 10. Buddy's first set of interrogatories and requests for production of documents requested, among other things, that Sherry produce:

*924 All checks or bank statements pertaining to each bank, savings and loan, stock brokerage, or other banking institution account, other than checking accounts, in which any interest whatsoever is or was held or claimed by or for you or for your benefit, alone or with your spouse or any other person at any time from January 1999 through 2004, to-date and through the date thirty (30) days prior to the date of trial in this case.
Sherry served her discovery responses on April 29, 2005. The responses indicated that Sherry's bank statements for one account through November 14, 2003, and for a second account through July 16, 2003, were available for copying and inspection at the office of Sherry's attorney upon reasonable notice. The responses listed each bank statement that was available.
¶ 11. Buddy's attorney conducted his initial inspection of the documents in the week before the hearing. The documents consisted of the same bank statements listed in the discovery responses but they were not updated to within thirty days of the trial as requested. On the day of the hearing, Buddy moved for a continuance and to compel discovery on the basis that Sherry had failed to comply with the discovery request. The chancellor agreed that Sherry's responses did not meet Buddy's discovery request but she declined to grant a continuance because discovery had been ongoing since 2004 and the bank statements had been available for inspection for over one year prior to the hearing. Moreover, the case had been set for trial by agreed order for two months and the court had allocated two days of its docket for the hearing. As a remedy for the discovery violation, the chancellor restricted Sherry to use only the information she actually provided to Buddy in discovery in presenting her case at trial.
¶ 12. Buddy contends that the chancellor's failure to grant a continuance subjected him to trial by ambush because Sherry's failure to properly respond to his document request left him unprepared to combat the income and expense information on Sherry's financial statement. The decision to grant or deny a continuance is within the sound discretion of the trial court and will not be reversed absent an abuse of discretion that resulted in a manifest injustice. In re Profilet, 826 So.2d 91, 93(¶ 6) (Miss.2002). We likewise review a trial court's ruling concerning discovery for abuse of discretion. Dawkins v. Redd Pest Control Co., Inc., 607 So.2d 1232, 1235 (Miss.1992).
¶ 13. Sherry's discovery response certainly was inadequate, but Buddy sought no relief until the day of trial. According to Rule 37(a) of the Mississippi Rules of Civil Procedure, "a party, upon reasonable notice to other parties and all persons affected thereby, may apply for an order compelling discovery...." It has been held that a motion to compel discovery made two business days prior to trial did not afford reasonable notice. Boutwell v. Boutwell, 829 So.2d 1216, 1223(¶ 31) (Miss.2002). Due to the lateness of Buddy's motion to compel, coupled with the fact that the hearing date was set two months previously by agreed order, the chancellor determined that the hearing should proceed with limitations on Sherry's presentation of evidence. We find that this resolution of the matter was within the chancellor's sound discretion. On review of the denial of a continuance, the supreme court has stated:
[A] trial court has the inherent right to control its trial docket and is afforded reasonable latitude regarding the setting and continuance of cases. Watts v. Pennington, 598 So.2d 1308, 1312 (Miss. 1992). "This Court will not reverse the *925 denial of a continuance unless it is satisfied that prejudice resulted." Cherry v. Hawkins, 243 Miss. 392, 397, 137 So.2d 815, 816 (1962).
Therefore, especially in light of the fact that the case was set by an agreed order, it does not appear that the trial court abused its discretion in denying Dew's continuance.
Dew v. Langford, 666 So.2d 739, 746 (Miss. 1995). This issue is without merit.

II. WHETHER THE CHANCELLOR ERRED IN DISMISSING BUDDY'S REQUEST FOR A DIVORCE ON THE GROUND OF ADULTERY.
¶ 14. After Buddy's presentation of his case, the chancellor dismissed Buddy's claim for a divorce upon a finding that the evidence was insufficient to establish adultery. "In Mississippi, one seeking a divorce on the grounds of adultery must show by clear and convincing evidence both an adulterous inclination and a reasonable opportunity to satisfy that inclination." Dillon v. Dillon, 498 So.2d 328, 330 (Miss.1986) (citing Owen v. Gerity, 422 So.2d 284, 287 (Miss.1982)). An adulterous inclination may be shown by either the defendant's infatuation for a particular person of the opposite sex or a general adulterous nature on the part of the defendant. Holden v. Frasher-Holden, 680 So.2d 795, 798 (Miss.1996) (citing McAdory v. McAdory, 608 So.2d 695, 700 (Miss. 1992)). Both the inclination and opportunity prongs of the test must be met; in the absence of proof of an adulterous inclination, proof of opportunity will not establish adultery. McAdory, 608 So.2d at 701. Direct evidence of adultery is not required because of the inherently secretive nature of adulterous relationships. Owen, 422 So.2d at 287. If circumstantial evidence is offered, the party asserting adultery as a ground must bear the following burden:
If there are two or more reasonable theories which may be drawn from the facts proven, the proof will be insufficient because, to invest mere circumstances with the force of truth, the conclusion must not only be logical, and tend to prove the facts charged, but must be inconsistent with a reasonable theory of innocence.
Id. (quoting Banks v. Banks, 118 Miss. 783, 787-88, 79 So. 841, 842 (1918)). A decision regarding a claim of adultery "ultimately requires the chancellor to make a finding of fact" which this Court will not set aside unless manifestly erroneous. Dillon, 498 So.2d at 330.
¶ 15. The strongest evidence pertaining to adultery was the private investigator's videotape establishing that Sherry spent three consecutive nights with Miller at his apartment. The videotape showed Sherry and Miller retrieving various items from Sherry's car and bringing them into the apartment on the first evening. A later part of the videotape showed a shirtless Miller emerging from the apartment and glancing around for less than one minute. Sherry also glanced around when she left one morning. The videotape showed several instances where Miller's curtains were moved aside so that the occupants could look out of the windows. The videotape did not show Sherry and Miller exhibiting any signs of affection toward one other. The investigator testified that he did not see Sherry and Miller together at any time besides the three nights.
¶ 16. In her answers to Buddy's requests for admissions, Sherry denied that she spent the night at Miller's apartment. But at the trial, Sherry admitted to spending the night at Miller's. She testified that Miller was sick during the three-day period. Sherry also testified that there was another woman in the apartment the *926 entire time who was willing to testify that Sherry did not have sexual relations with Miller. Sherry stated that Miller slept on the couch in the living room and she and the woman slept in Miller's bedroom. The private investigator testified that he did not see anyone else enter or exit the apartment, but he could not state unequivocally that there was no one else present because the apartment had two doors which he was unable to monitor simultaneously. Buddy gave rebuttal testimony that he saw Sherry and Miller together on three occasions: (1) when Miller was driving Sherry's car, (2) when Sherry and Miller were eating at a restaurant with a group of people, and (3) when he observed Sherry and Miller holding hands in a restaurant parking lot. This is contrasted with Buddy's earlier testimony that he could not recall having seen Sherry being affectionate with another man.
¶ 17. The chancellor found that Sherry's behavior at Miller's apartment was inappropriate and that it was troubling that Sherry was untruthful when she denied having spent the night at Miller's apartment on the nights in question in her responses to Buddy's requests for admissions. The chancellor noted that on the videotape Miller did not appear to be sick. However, the chancellor concluded that the proof did not rise to the level of clear and convincing evidence, reasoning that Sherry's three consecutive nights at Miller's comprised an isolated incident and that the investigator did not note anything else worthy of reporting during his observation of Sherry on and off for over one year. The chancellor found that, though Sherry clearly had the opportunity to commit adultery, there was no evidence before the court showing Sherry had any infatuation or feelings for Miller beyond friendship.
¶ 18. Buddy argues that the videotape establishing that Sherry spent the night with Miller, in addition to establishing opportunity, was also sufficient to establish that Sherry was infatuated with Miller. We disagree. The videotape revealed no activity between the two evincing that Sherry was infatuated with Miller; the videotape showed no physical contact between them indicative of a physical relationship. In Hassett v. Hassett, 690 So.2d 1140, 1148 (Miss.1997), the court affirmed a divorce on the ground of adultery. In that case, a private investigator videotape proving that a wife spent the night with a man at a hotel was evidence of infatuation when considered in combination with letters from the man containing terms of endearment. Id. In the instant case, the only other evidence tending to show infatuation was Buddy's rebuttal testimony that he had seen Sherry and Miller together three times, once holding hands. This scant evidence of infatuation was cast into doubt by Buddy's testimony on direct examination.
¶ 19. Additionally, the wife in Hassett provided no reasonable theory of innocence. Id. In this case, Sherry testified that Miller was sick on the nights in question, that she did not have sexual relations with Miller, and that she had a female witness willing to testify that she was present in the apartment at the relevant times and that Sherry did not have sexual relations with Miller. In McAdory, the husband's primary proof of adultery consisted of a photograph of the wife's co-worker wearing only shorts and lying on the wife's bed. McAdory, 608 So.2d at 697. The wife explained that she was not present when the photograph was taken and that it had been taken by her girlfriend as a joke. Id. The court found that the evidence did not rise above mere suspicion and, while the evidence was consistent with a conclusion of adultery, it was also *927 consistent with the wife's theory of innocence. Id. at 700. Consistent with McAdory, the chancellor in this case did not manifestly err by finding that the circumstantial evidence presented by Buddy was consistent with a reasonable theory of innocence and did not constitute clear and convincing proof of adultery. We affirm the chancellor's dismissal of Buddy's claim for a divorce on the ground of adultery.

III. WHETHER THE CHANCELLOR ERRED BY ORDERING BUDDY TO PAY SEPARATE MAINTENANCE.
¶ 20. Having denied Buddy's request for a divorce, the chancellor found that separate maintenance was appropriate. "Separate maintenance is `court created equitable relief' based upon the marital relationship." Lynch v. Lynch, 616 So.2d 294, 296 (Miss.1993). The purpose of a decree for separate maintenance is to compel the husband to "resume cohabitation with his wife or to provide for her separate maintenance." Thompson v. Thompson, 527 So.2d 617, 622 (Miss.1988). The amount of separate maintenance awarded should be sufficient to maintain the wife in the same standard of living as she enjoyed prior to the separation, without unduly depleting the husband's estate. Bridges v. Bridges, 330 So.2d 260, 262 (Miss.1976). The amount awarded to the wife should be "the same sort of normal support and maintenance ..., all things considered, as she would have received in the home, if the parties had continued normal cohabitation, and the wife had helped in a reasonable way, in view of her health and physical condition." Id. at 263 (quoting Bunkley and Morse, Amis on Divorce and Separation in Mississippi, § 7.04, p. 205 (1957)).
¶ 21. The chancellor may award separate maintenance when (1) the parties have separated without fault by the wife and (2) the husband has willfully abandoned the wife and refused to support her. Lynch, 616 So.2d at 296. However, the wife need not have been totally blameless to be entitled to separate maintenance. Id. (citing Robinson v. Robinson, 554 So.2d 300, 304 (Miss.1989)). To be denied separate maintenance on the basis of fault, the wife's misconduct must have materially contributed to the separation. Id.
¶ 22. Buddy challenges the chancellor's finding that Sherry was entitled to separate maintenance; he does not contest the amount of the separate maintenance award. He contends that Sherry was clearly at fault for his departure from the marital home because: (1) she admittedly took the stress of her job out on him, (2) she asked him to leave, and (3) prior to this request she transferred assets into her own name. He further argues that her conduct in spending the night at Miller's apartment on three nights after the separation demonstrated her unwillingness to reconcile.
¶ 23. Certainly, there was testimony from Buddy that Sherry nagged him about the housework and she did admit to having taken some stress out on him. The chancellor found that this misconduct did not materially contribute to the separation and that it was Buddy's desire to discontinue the marital relationship that precipitated the separation. These findings were supported by substantial evidence. The overwhelming evidence adduced at the hearing was that the separation occurred because Buddy wanted to leave and, from the date of separation onward, he harbored no desire to reconcile. Sherry testified that she begged Buddy not to leave and told him she would go to counseling to work on the marriage. Sherry stated that she loved Buddy and expressed her willingness to have Buddy back in the home. *928 The chancellor found that it was obvious Sherry still cared for Buddy and that she was obviously upset during her testimony about the circumstances surrounding Buddy's departure. It was within the chancellor's discretion to weigh this testimony by Sherry more heavily than her conduct regarding Miller. Viewed in the light most favorable to the chancellor's ruling, the evidence imparted that Buddy was unwilling to remain in the home despite Sherry's willingness to work to remedy her offending behavior.
¶ 24. Concerning Sherry's request that Buddy leave on November 29, 2003, it was undisputed that, the previous month, Buddy announced he was leaving the marital home, rented an apartment, and began transferring assets into his own name. It was only after these events occurred that Sherry told Buddy that if he was still going to leave, he needed to actually do so. As found by the chancellor based on Sherry's testimony, Sherry's transfer of assets into her name was an act of self-protection given the measures taken by Buddy. The chancellor's finding that Sherry's misconduct did not materially contribute to the separation and that she was entitled to separate maintenance is supported by substantial evidence. This issue is without merit.

IV. WHETHER THE CHANCELLOR ERRED BY AWARDING ATTORNEY'S FEES TO SHERRY.
¶ 25. The chancellor awarded Sherry $5,000, amounting to two-thirds of her attorney's fees. Buddy argues the award was erroneous because (1) the chancellor did not make an on-the-record examination of the factors from McKee v. McKee, 418 So.2d 764, 767 (Miss.1982); (2) Sherry is younger and in better health than Buddy; and (3) Sherry is still working and has adequate funds with which to pay her attorney's fees.
¶ 26. In general, attorney's fees will not be awarded in the domestic relations setting unless the requesting spouse establishes an inability to pay the fees. Doe v. Doe, 644 So.2d 1199, 1208 (Miss.1994). Whether to award attorney's fees is a matter within the chancellor's sound discretion, and this Court will reverse an attorney's fees award only when the award amounts to an abuse of discretion. McKee, 418 So.2d at 767. The sum awarded should be sufficient to secure the services of a single competent attorney. Id. There are several factors that should be considered in determining the amount of attorney's fees:
The fee depends on consideration of, in addition to the relative financial ability of the parties, the skill and standing of the attorney employed, the nature of the case and novelty and difficulty of the questions at issue, as well as the degree of responsibility involved in the management of the cause, the time and labor required, the usual and customary charge in the community, and the preclusion of other employment by the attorney due to the acceptance of the case.
Id.
¶ 27. In this case, the chancellor did not cite the McKee factors in rendering the award of attorney's fees. However, the failure to cite controlling authority in rendering an attorney's fees award is not grounds for reversal unless the failure to make sufficient findings of fact and conclusions of law constituted manifest error. A & L, Inc. v. Grantham, 747 So.2d 832, 845(¶ 61) (Miss.1999). Sherry's attorney testified that, beginning in December 2003, he provided forty-six hours of legal services to Sherry at a rate of between $150 and $200 per hour, and that Sherry had made periodic payments *929 totaling $2,850. The chancellor determined that Sherry's attorney's fees totaled approximately $7,500 and awarded $5,000 as a reasonable award of attorney's fees. In rendering the award, the chancellor observed that Sherry was forced to defend Buddy's divorce action. This action required Sherry to defend against three grounds for divorce, two of which Buddy eventually withdrew. We find that the chancellor's finding that the fee was reasonable did not constitute manifest error.
¶ 28. Buddy also challenges the award on the basis that Sherry was still working and had the funds to pay the fees. Buddy asserted this issue in his motion for a new trial, and the chancellor held a hearing on the motion. The evidence showed that, although Sherry was still working and Buddy was retired, Buddy's monthly income significantly exceeded Sherry's. Before the separate maintenance award, Sherry's monthly expenses of $2,712.08 exceeded her monthly income of $1,446.27, while Buddy's monthly expenses of $2,266.39 were below his monthly income of $3,366.89. Moreover, Buddy's financial statement disclosed that $430 of his monthly expenses consisted of a voluntary contribution to a religious school. Buddy had a checking account balance of $7,000, while Sherry had only a $1,550 checking account balance. Additionally, Buddy disclosed a $39,513.89 retirement account and testified that he had $20,000 in savings bonds. The parties shared a retirement account that contained approximately $150,000.
¶ 29. At the motion hearing, Buddy argued that Sherry was not entitled to attorney's fees. In support of this argument, Buddy cited Sherry's testimony that, after the separation and upon her attorney's advice, she transferred $20,000 from a joint account into an account in her own name. Sherry further testified that she still had access to the funds. Buddy argued that Sherry could afford to use these funds to pay her attorney. The chancellor disagreed and found that the parties' significant disparity in income justified the award of attorney's fees to Sherry.
¶ 30. We find that the attorney's fees award was within the chancellor's discretion. The chancellor carefully reviewed the financial status of each party. The separate maintenance award, in combination with Sherry's income, was just enough to cover her monthly expenses and did not accommodate her payment of the attorney's fees she owed. Buddy clearly possessed the ability to pay Sherry's attorney's fees. Sherry's only liquid asset was the $20,000 account. The supreme court in Hemsley v. Hemsley, 639 So.2d 909, 915 (Miss.1994), declined to require the wife to liquidate part of her savings account to pay her attorney's fees where the alimony award was barely sufficient to cover her monthly expenses. Under the similar circumstances presented in this case, we find that the chancellor did not abuse her discretion in awarding Sherry attorney's fees.
¶ 31. Finally, Sherry moves this Court to award her attorney's fees on appeal. She cites Lauro v. Lauro, 924 So.2d 584, 592(¶ 33) (Miss.Ct.App.2006), which provides that the appellate court will generally award attorney's fees on appeal in the amount equal to one-half what was awarded in the lower court. In accordance with Lauro, we award Sherry $2,500 for her attorney's fees on appeal.
¶ 32. THE JUDGMENT OF THE CHANCERY COURT OF LAUDERDALE COUNTY IS AFFIRMED. THE MOTION OF SHERRY CLAY POOL REQUESTING ATTORNEY'S FEES ON APPEAL IS GRANTED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
*930 KING, C.J., LEE AND MYERS, P.JJ., GRIFFIS, BARNES, ISHEE AND CARLTON, JJ., CONCUR. IRVING, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. ROBERTS, J., NOT PARTICIPATING.