## IN THE SUPREME COURT OF MISSISSIPPI
### NO. 95-CA-00496-SCT

*MAMIE (KING) DERRYBERRY*

*v.*

*RAYMOND RAYFORD DERRYBERRY*

### THIS OPINION IS NOT DESIGNATED FOR PUBLICATION AND MAY NOT BE CITED PURSUANT TO M.R.A.P. 35-A

| | |
|---|---|
| DATE OF JUDGMENT: | 03/21/95 |
| TRIAL JUDGE: | HON. PERCY LEE LYNCHARD JR. |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | JAMES W. AMOS |
| ATTORNEY FOR APPELLEE: | RONALD L. TAYLOR |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 7/17/97 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 8/7/97 |

**BEFORE PRATHER, P.J., BANKS AND SMITH, JJ.**

**PRATHER, PRESIDING JUSTICE, FOR THE COURT:**

### I. STATEMENT OF THE CASE

First cousins Mamie King Derryberry (age 61) and Raymond Rayford Derryberry (age 64) were married in California on December 28, 1991. They separated in DeSoto County, Mississippi on October 14, 1994. On October 19, 1994, Mamie filed for divorce on the ground of habitual cruel and inhuman treatment, or, in the alternative, for irreconcilable differences. On November 14, 1994, Raymond filed his answer and counter-complaint for divorce on the ground of habitual cruel and inhuman treatment, or, in the alternative, for irreconcilable differences. On February 8, 1995, Raymond's counter-complaint was amended to contain the allegation that the marriage was void as between two cousins, or, in the alternative, that, the kinship between the parties was a ground for divorce.

The matter was tried March 17-21, 1995, after which, the trial judge found that the marriage should be recognized as valid. Specifically, the chancellor held that the marriage was valid under California law and was not made with the intent to evade the Mississippi law prohibiting marriage between

cousins. The chancellor then granted the divorce to Raymond pursuant to the eleventh ground for divorce under Miss. Code Ann. § 93-5-1, which is kinship of the degree at issue in this case. The chancellor also found that neither party was subjected to habitual cruel and inhuman treatment.

With regard to the marital property, the chancellor awarded a condominium in Torrence, California to Mamie, and made Mamie responsible for any indebtedness on that property. The chancellor granted the marital home in Southaven, Mississippi to Raymond, and made him responsible for any indebtedness on that property. The chancellor awarded all cash accounts held by the parties as individuals to the individual whose name was on the account at the time of the divorce. The chancellor found that contributions to the joint savings account of approximately $12,000 were "overwhelmingly" made by Raymond and his adopted minor son and awarded those funds to Raymond. The chancellor denied Mamie's request for alimony, and held that each party should be responsible for his or her own attorney fees.

From this judgment, Mamie appeals and raises the following issues:

**A. Whether the chancellor erred in granting the appellee a divorce on the grounds set forth in Section 93-5-1 (11), Miss. Code Ann. (1972), which states that either party may have a divorce if they be related to each other within the degree of kindred between whom marriage is prohibited by law?**

**B. Whether the chancellor erred in denying the appellant a divorce from the appellee on the grounds of habitual cruel and inhuman treatment?**

**C. Whether the chancellor failed to make an equitable division of marital property?**

**D. Whether the chancellor erred in denying appellant alimony?**

## II. STATEMENT OF THE FACTS

This was the second marriage for both Mamie and Raymond, who are first cousins. Mamie had previously been married for thirty-two years and had lived in Mississippi. She moved to a condominium in California in 1979 and divorced her first husband in 1980. Raymond's first wife of forty-three years died from cancer in 1989. After Raymond's first wife died, Mamie contacted him. They "courted" for approximately six months, and they married in California, where Mamie's friends and family were located.

Several years before he married Mamie, Raymond had adopted his two grandchildren: Paul and Shannasee. At the time of the marriage, Paul was twenty-two years old and Shannasee was twelve years old. Mamie did not adopt either of them.

The parties returned to Mississippi and built a new home in Southaven. Raymond told Mamie she could redecorate his previous house; however, Mamie did not feel comfortable living in the home Raymond shared with his first wife. To resolve this situation, Mamie and Raymond agreed to sell their homes and have a new one built. Raymond sold his old home and put all the proceeds toward the new marital home. Despite the fact that she received offers on it, Mamie never sold her California condominium.

The cost of the new 2,700-square-foot marital home in Southaven was approximately $104,000. Raymond sold his previous home for $44,902.63 and made a $33,528.13 down payment on the marital home. He also paid for and provided much of the labor for improvements such as a garage, driveway, sidewalk, deck, patio, landscaping, wallpaper, drapes, curtain rods, blinds, gutters, and storm doors. Raymond's total contributions to the marital home were $49,416.13. In addition, Raymond financed approximately $25,000 in furniture, a debt which he had retired prior to the divorce proceedings. Mamie "worked really hard" to decorate the marital home.

The balance on the mortgage of the marital home was $53,000, and the monthly payment was approximately $557. Mamie made two payments of under $200 each, and Raymond made the rest. Mamie had the house unofficially appraised at $123,700, and Raymond testified that the house had been appraised at $112,000 in 1994.

Mamie and Raymond also owned a condominium in California that had been Mamie's prior to the marriage. With Raymond's assistance, Mamie refinanced the condominium for a better interest rate in 1994. Because Raymond had signed for the loan, Mamie deeded a one-half interest in the condominium to Raymond at that time.

Mamie had been advised by a real estate company that the condominium was worth approximately $89,000. However, Raymond testified that the condominium had previously been appraised at $125,000 and $105,000. The unpaid balance of the mortgage was $85,000. Mamie originally paid $112,900 for the condominium, and she had made approximately $1,000 in improvements.

Raymond's banking records reflect that he paid approximately $2,600 on the mortgage, taxes, and homeowner's association fees for the condominium. However, Mamie testified that she reimbursed Raymond for approximately $1,537 of those expenses.

Mamie also stated that she had tried to sell the California condominium for two years, but that she was unable to do so. Raymond had supplied plane tickets to California, materials, and his own labor to renovate the condominium in anticipation of a sale. Mamie stated that she had only one offer on the condominium of $130,000, but, at the time, the condominium was worth more than $130,000. Furthermore, because the offeror wanted Mamie to guarantee the appliances and the air conditioner for one year, Mamie would not sell. According to Raymond, Mamie received and declined a second offer of a little more than her purchase price of $112,000 for the condominium.

Raymond was willing to give Mamie the condominium in exchange for the marital home, even though he had "a lot more in" the condominium than Mamie had in the marital home. Raymond's desire to keep the marital home was primarily due to the fact that he had custody of his minor son (whom Mamie had not adopted). Raymond felt that he was "too old to try to do all this again."

Aside from the marital home and the California condominium, Mamie's assets included:

1. a 1983 Cadillac that she owned prior to the marriage;

2. a $12,000 joint savings account with Raymond at Trustmark Bank, to which Mamie admitted she did not contribute any money;

3. a checking account with Hughes Credit Union in the amount of $1,440, which Mamie and Raymond agreed would be used if they needed money while visiting in California;

4. a term life insurance policy for coverage of $5,600 that was scheduled to have been reduced to $2,000 in coverage by December 1, 1995;

5. a $44,000 profit-sharing/retirement account with Nationwide Insurance Company from which she could (without penalty) draw 10% per year until 1999, but did not; and,

6. two cemetery plots in California.

Aside from the California condominium and the marital home, Raymond's assets included:

1. a 1989 Chevrolet van;

2. a 1994 Ford truck;

3. $8,800 in an I.R.A.;

4. a $2,933.00 checking account in his and his son's names;

5. a $12,000 joint checking account at Trustmark bank, to which Raymond made all the contributions, and of which $2,500 belonged to his son;[1] and,

6. a life insurance policy to pay off the mortgage on the house.

Mamie testified that, prior to her marriage to Raymond, she lived in California near her family, where she had been employed at Hughes Aircraft for ten years as a telephone operator. When she and Raymond married, she retired early (which decreased her pension by 20%) and moved to Southaven with Raymond. Mamie had a high school education, and when she retired December 1, 1991, she was earning approximately $30,000 per year.

Mamie's monthly income consisted of $256.17 in pension from Hughes Aircraft; $473.00 from Social Security; and, the $750 rent on her California condominium, for a total of $1,479.17. Mamie estimated her minimum monthly expenses at $1,553.49. She also stated that she could not return to her old job and that she anticipated having "major surgery" as soon as the doctors could schedule it. Mamie stated that she could not afford to return to California to live, and that she planned to stay in Mississippi after the divorce.

Mamie also stated that she was incapable of maintaining the standard of living to which she had been accustomed both prior to and during the marriage. She estimated that she would need an extra $600

per month as alimony just to survive -- at least until the money in the $44,000 annuity became available to her in 1999.

Raymond worked for twenty-one years as a lumber inspector for J. T. Shannon Lumber Company. He earned $4.77 per hour plus a bonus of $1.50 per thousand feet of lumber he inspected. Raymond could inspect approximately 9,000,000 feet of lumber per year, and would earn about a $13,000 bonus each year. Raymond testified that he worked past age sixty-five because he "got married, bought a new home and had to furnish it, so [he] had to work to pay for it." He decided to retire around Christmas, 1994, because the company was phasing out the bonuses, and he could make about the same amount drawing social security as his wages less the bonus. He actually stopped working in March, 1995. According to family friend, Harry McRay, Mamie stated that if Raymond were going to retire, she might as well file for divorce. McRay did not know what Mamie meant. Mamie denied making this statement.

Raymond drew $1,219 per month Social Security for himself and $590 per month for his son. After deductions, Raymond's net income was $1,529 per month. Raymond did not have any retirement income from the lumber company. He estimated that the total monthly expenses for him and his son were $1,603.90. Raymond stated that he could not pay Mamie the $600 per month she had requested. He thought she should pay him alimony:

Well, she's still got everything she had when [they] began the marriage plus [Raymond had] thousands of dollars less in the savings account and [Raymond had] made about $160,000.00 during the time that [they had] been married that hadn't been one dime saved. In fact, the $160,000.00 didn't even pay the expenses. [Raymond] had to pay some extra money out of the savings account that [Raymond and son] already had.

Raymond also testified that Mamie had the $44,000 retirement account and that, financially, she was "a whole lot better off" than he.

Raymond admitted that he asked Mamie to write the checks to pay the bills. However, he stated that Mamie kept her monthly income in a separate checking account and repeatedly refused to put her money in the joint account with his income. Mamie testified that most of her social security checks were deposited directly into her California account.

With regard to her allegations of cruel and inhuman treatment, Raymond believed that he treated Mamie like a queen: "[S]he carried the checkbook, she bought what she wanted, she went where she wanted to, she come home when she wanted to." Raymond and his friends were shocked when Mamie alleged that he had mistreated her. Raymond's sister as well as a family friend corroborated Raymond's testimony that he treated Mamie well.

On the other hand, Mamie felt as though she gave up her family, her job, and part of her pension to come to Mississippi. She felt that Raymond had gained everything, and that he was in "much better shape" at the time of the divorce than when they married. She also stated that she had taken care of the minor child for three years, until he was old enough (in Raymond's view) to stay by himself at age sixteen. In addition, Mamie never felt that she could be herself around men because Raymond was jealous. Raymond testified that he was not jealous, only embarrassed by Mamie's behavior in hugging

other men.

Mamie admitted that Raymond was a good provider and that he never "physically touched" her or "laid a hand" on her. Raymond testified that he never physically abused Mamie, but that "anytime [he didn't] agree with her to her it's mental abuse."

Mamie testified that she began seeing a psychiatrist in September, 1994, because she could not sleep. Raymond stated that she did not go to a psychiatrist until after she filed for divorce in October, 1994. Mamie testified that she could not concentrate and that she was very irritable and negative. Mamie's nervousness and concern over her marriage were corroborated by her daughter and a friend.

According to Mamie, the psychiatrist told her that she was depressed and prescribed Prozac for several weeks. The Prozac was discontinued for Elavil, and Mamie was taking Elavil for depression at the time of the divorce. Mamie testified that her condition had improved since the separation. By "separation", Mamie meant that she was in one bedroom and Raymond was in another. Neither party had moved from the marital home at the time of the divorce.

## III. LEGAL ANALYSIS

Our scope of review in domestic relations matters is limited by our familiar substantial evidence/manifest error rule.

"This Court will not disturb the findings of a Chancellor unless the Chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied."

In other words, "[o]n appeal [we are] required to respect the findings of fact made by a chancellor supported by credible evidence and not manifestly wrong." "If we find substantial evidence supporting the chancellor's fact findings, they are beyond our power to disturb."

*Parker v. Parker*, 641 So. 2d 1133, 1137 (Miss. 1994) (citations omitted).

**A. Whether the chancellor erred in granting appellee a divorce on the grounds set forth in Section 93-5-1 (11), Miss. Code Ann. (1972), which states that either party may have a divorce if they be related to each other within the degree of kindred between whom marriage is prohibited by law?**

Mamie's first argument is that the chancellor erred by granting Raymond the divorce on the ground that they were first cousins. However, Mamie's argument is contrary to the Mississippi statutes regarding marriage between first cousins. Miss. Code Ann. § 93-5-1 (Supp. 1996) provides: "Either party may have a divorce if they be related to each other within the degrees of kindred between whom marriage is prohibited by law." Miss. Code Ann. § 93-1-1 (Supp. 1996) provides that "the children of brother or sister, or brothers and sisters [shall not] intermarry being first cousins by blood." Miss. Code Ann. § 93-1-3 (Supp. 1996) provides that "[a]ny attempt to evade [Miss. Code Ann. §] 93-1-1 by marrying out of this state and returning to it shall be within the prohibitions of said section."

The chancellor found that Mamie and Raymond were first cousins; that they were validly married in California; and, that they did not marry in California to evade the Mississippi law prohibiting marriage between first cousins. As a result the chancellor found that Raymond was entitled to a divorce based on the fact that Raymond and Mamie were first cousins.

These findings are completely supported by the record. Both parties admitted that they were first cousins. Both parties testified that they married in California because Mamie's friends and family were there. At the time of their marriage, neither party knew that marriage between first cousins was prohibited by law in Mississippi. Although either party may be granted a divorce from his first cousin under Miss. Code Ann. § 93-5-1, only Raymond asserted this ground for divorce. Therefore, the chancellor did not err in granting Raymond a divorce on the ground that Mamie and Raymond were first cousins. Mamie's argument to the contrary is without merit.

**B. Whether the chancellor erred in denying appellant a divorce from the appellee on the grounds of habitual cruel and inhuman treatment?**

Mamie next contends that the chancellor should have granted her a divorce from Raymond on the ground of habitual cruel and inhuman treatment. Both parties testified that Mamie was not physically abused. Mamie testified that she was emotionally damaged by Raymond's violent and unpredictable temper and jealousy, such that she sought the care of a psychiatrist. Mamie's deteriorating emotional well-being was corroborated by her daughter and a friend. However, Raymond testified that he never mistreated Mamie, but that Mamie considered herself mentally abused whenever he disagreed with her. Raymond's excellent treatment of Mamie was corroborated by his sister and a friend.

The divorce grounds of habitual cruel and inhuman treatment may be established by a showing of conduct that either (1) endangers life, limb, or health, or creates a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief, or (2) is so unnatural and infamous as to make the marriage revolting to the non-offending spouse and render it impossible for that spouse to discharge the duties of marriage, thus destroying the basis for its continuance. Habitual cruel and inhuman treatment may be established by a preponderance of the evidence, and the charge "means something more than unkindness or rudeness or mere incompatibility or want of affection." On appeal, this Court will overturn the chancery court only when its findings were manifestly wrong and there is no substantial evidence to support those findings.

*Hassett v. Hassett*, 690 So. 2d 1140, 1146 (Miss. 1997).

The evidence of Raymond's alleged cruel and inhuman treatment of Mamie, if any, was contradictory at best. Furthermore, there is evidence that Raymond treated Mamie very well. Moreover, Mamie's claim that she was cruelly treated by Raymond is belied by the fact that she chose to remain in the marital home with Raymond from the time she filed for divorce until the time the divorce was heard. Thus, there is substantial evidence to support the chancellor's ruling that Mamie was not subjected to habitual cruel and inhuman treatment. The chancellor did not err by so ruling. Mamie's argument to the contrary is without merit. *See Id.* (where this Court held that husband's alleged bullying, intimidation, and constant criticism of wife along with husband's violent temper and tendency to

throw objects when angry did not rise to the level of habitual cruel and inhuman treatment).

## C. Whether the chancellor failed to make an equitable division of marital property?

Mamie next contends that the chancellor erred in dividing the marital property. Specifically, Mamie contends that she "was granted far less of an interest in the real property than which she was entitled." She argues that the chancellor misapplied *Ferguson v. Ferguson*, 639 So. 2d 921, 929-30 (Miss. 1994), by failing to consider the declining market value of the California condominium:

Appellant argues that the market value of the marital home, when considering the equity in said property, far exceeds the value of her condo in California. For all practical purposes, the condo is valueless. She had tried to sell it for some time but had not been able to do so. The marital home, on the other had, is appreciating in value at a rapid pace. Further, the emotional value is far greater to Mamie. She had worked very hard to make the house into a lovely home . . .

Indeed, under *Ferguson*, "[p]roperty division should be based upon a determination of fair market value of the assets, and these valuations should be the initial step before determining division." *Ferguson*, 639 So. 2d at 929. However, this Court in *Ferguson* also listed eight guidelines for equitable distribution of marital property:

1. Substantial contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows:

a. Direct or indirect economic contribution to the acquisition of the property;

b. Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and

c. Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets.

2. The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise.

3. The market value and the emotional value of the assets subject to distribution.

4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;

5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;

6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;

7. The needs of the parties for financial security with due regard to the combination of assets, income

and earning capacity; and,

8. Any other factor which in equity should be considered.

*Id.*

Mamie contended at trial that the California condominium was worth approximately $89,000. She paid approximately $112,000 for it, and had at one time been offered $130,000 for it. However, even if this Court were to accept the $89,000 figure as the fair market value for the condominium, that fact alone would not negate the chancellor's distribution of the property in this case.

In considering the *Ferguson* factors, the record reflects that Mamie owned the condominium at the time she and Raymond married. Furthermore, Mamie was able to obtain a better rate of interest on the condominium's mortgage with Raymond's assistance. On the other hand, Raymond sold his previous home and put all proceeds toward the marital home. Raymond understood that Mamie would sell the condominium and contribute to the purchase of the marital home. However, even though Mamie had offer(s) on the condominium for more than her purchase price of $112,000, she refused to sell the condominium. Mamie kept the vast majority of her money separate from Raymond's, and the parties apparently paid their expenses from the money that Raymond earned while Mamie stayed at home and tended to Raymond's teenage son.

In fact, the parties spent all Raymond's salary during the time they were married and $6,000 of the $18,000 Raymond had saved with his first wife. On the other hand, Mamie's income was deposited in her California account, and very little of Mamie's income, if any, appeared to have been spent by the parties during the course of the marriage. Furthermore, Mamie had $44,000 in a retirement account. Raymond had approximately $12,000 in savings and an $8,800 IRA account. Both parties physically contributed to the renovation and decoration of the California condominium and the marital home. However, Raymond made practically all the financial contributions to the beautification and upkeep of these properties. Moreover, at Mamie's request, Raymond sold his old furniture and paid for new furniture to replace it; Mamie received some of this new furniture in the property settlement. In addition, Raymond particularly desired ownership of the marital home, in order to provide a nice place for his minor son to live.

It is true that Mamie gave up her job and moved to Mississippi to marry Raymond. However, Mamie saved her income during the marriage, and the parties depleted Raymond's income and one-third of the savings he brought to the marriage. Mamie allowed Raymond to sell his previous home and build another, yet she refused to sell hers as she had agreed to do. Mamie had twice the amount in a retirement account that Raymond had in savings. Therefore, having considered all these factors, the chancellor did not err by awarding Mamie the condominium (which she owned prior to the three-year marriage) and by awarding Raymond the marital home (which was bought with the proceeds from the sale of the home owned by Raymond prior to the marriage).

**D. Whether the chancellor erred in denying appellant alimony?**

Mamie's final contention is that the trial judge erred by denying her alimony. Mamie argues that she

was entitled to periodic alimony or, at the very least, to rehabilitative periodic alimony to allow her to become self-supporting without becoming destitute in the interim.

"The general rule is that the wife is entitled to a reasonable allowance of alimony commensurate with her accustomed standard of living and the ability of the husband to pay." *Hockaday v. Hockaday*, 644 So. 2d 446, 448 (Miss. 1994). "'Rehabilitative periodic alimony' is not intended as an equalizer between the parties but is for the purpose of allowing the less able party to start anew without being destitute in the interim." *Hubbard v. Hubbard*, 656 So. 2d 124, 129 (Miss. 1995).

The following factors are to be considered by the chancellor in arriving at findings and entering judgment for alimony:

1. The income and expenses of the parties;

2. The health and earning capacities of the parties;

3. The needs of each party;

4. The obligations and assets of each party;

5. The length of the marriage;

6. The presence or absence of minor children in the home, which may require that one or both of the parties either pay, or personally provide, child care;

7. The age of the parties;

8. The standard of living of the parties, both during the marriage and at the time of the support determination;

9. The tax consequences of the spousal support order;

10. Fault or misconduct;

11. Wasteful dissipation of assets by either party; or

12. Any other factor deemed by the court to be "just and equitable" in connection with the setting of spousal support.

*Armstrong v. Armstrong*, 618 So. 2d, 1278, 1280 (Miss. 1993).

The record reflects that the chancellor in the case at hand made a detailed finding of fact with regard to each of these twelve factors:

I'll briefly and very quickly go through those twelve (12) factors because they are extremely important, two in this particular case jump out at you. First of all, the Court is to consider the income and expenses of the parties. The income of the parties at this point is basically social security for both of them. Mr. Derryberry obviously draws more social security than Mrs. Derryberry, according to his

financial sheet, however that is largely as a result of social security payments being made to the adopted son which he has living at home and I will address that issue in a second. The health and earning capacities of the parties. Both parties at this point and time have very little earning capacity, both having sought voluntary retirement. Both parties, although evidence of surgery being necessary for Mrs. Derryberry was raised appears to be good. Mr. Derryberry testified that the type of surgery of which she may be of need that he was aware was basically the same which she would have required prior to the marriage. The needs of each party is a third factor. Obviously their needs are more or less similar. The obligation and assets of each party. Neither have financial obligations, other than indebtedness which exists on former homesteads or present homesteads of the parties. The condo in Torrence, California, which following this Courts [sic] ruling will be vested entirely in that of Mrs. Derryberry. At this point and time because of the earning capacity and the credit worthiness of her husband at the time, has greatly diminished the monthly obligations due. At the same time, the Defendant has a very similar obligation toward the homestead. The assets of each party by the numbers is not far from different, basically Mr. Derryberry has his assets in real estate, Mrs. Derryberry has her assets in retirement. The length of the marriage is a strong consideration. This marriage is less than three (3) years old. The presence or absence of minor children in the home, which may require that one or both of the parties either pay or personally provide child care. This is not a child of this marriage, is not an adoptive child of the Plaintiff, but is a minor child who will reside in the home of the Defendant and whose care will be the sole responsibility of course of the Defendant and that is an element which is -- weighs very strongly in Mr. Derryberry's favor. The age of the parties, although certainly not identical, is very similar, both being in their sixties. The standard of living of the parties, both during the marriage and at the time of the support determination. The standard of living of the parties is basically similar now as it was prior to their marriage. Both have, for lack of a better terminology, upgraded themselves as far as the real estate which they own. The testimony was that the condo which is owned by Mrs. Derryberry has been improved at the or rather with the assistance of Mr. Derryberry. The home which Mr. Derryberry has purchased with funds which he derived prior to the marriage, largely from the sale of the other residence, was improved with the assistance of Mrs. Derryberry, almost a trade off. The tax consequences of the spousal support order is not much of a factor. Fault or misconduct, I don't think either party has substantial grounds for a divorce short of one of two things. One which the Court awards statutorially [sic] because of the kinship of the parties, the other for irreconcilable differences, which barring agreement of the parties the Court would be unable to award. I don't find any fault or misconduct. This is obviously, anytime a marriage dissolves it is not a happy situation, but to say that the action of either party would amount to habitual cruel and inhuman treatment, the Court doesn't find sufficient testimony or sufficient evidence of same. The wasteful dissipation of assets by either party, I don't find that to be a factor. Mr. Derryberry would have the Court believe that his wife was one who spent all of his money and he had very little means of controlling it, but at the same time I find that Mr. Derryberry pretty much enjoyed his wife spending what she wanted and at the same time enjoyed spending money for her. I don't find that the wasteful dissipation of assets by either party is a factor. Then, twelve, a catch all factor, which courts always throw in in case they have neglected something, which is any other factor deemed by the Court to be just and equitable.

Based upon the application of the factors set forth in *Armstrong* the Court does not find that this case is one which would justify alimony in either form, whether lump sum or periodic.

The chancellor applied the correct standards and accurately assessed the facts adduced at trial in the light thereof. Therefore, the chancellor did not abuse his discretion in finding that Mamie was not entitled to alimony.

## IV. <u>CONCLUSION</u>

The chancellor properly granted Raymond a divorce on the ground that Raymond and Mamie are first cousins. Furthermore, there was very little evidence, if any, of Raymond's alleged habitual cruel and inhuman treatment of Mamie; therefore, the chancellor properly denied Mamie a divorce on this ground. In addition, the trial judge did not err in dividing the marital property or in denying Mamie alimony. For all these reasons, the judgment of the chancellor is affirmed.

**JUDGMENT IS AFFIRMED.**

**LEE, C.J., SULLIVAN, P.J., PITTMAN, BANKS, McRAE, ROBERTS, SMITH AND MILLS, JJ., CONCUR.**

1. Although Mamie admitted that she did not contribute any money to the $12,000 Trustmark account, she denied that any of the money belonged to Raymond's minor son.